UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

SUSAN GOLDFADEN,

      Plaintiff,

v.

WYETH LABORATORIES, INC.
and ROBERT MONOVICH,

      Defendants.

Case No. 08-10944

Hon. Victoria A. Roberts

_____

**OPINION AND ORDER**

**I.**    **INTRODUCTION**

This matter is before the Court on:

(1)  Plaintiff's Motion for Partial Summary Judgment [Dkt #70];

(2)  Defendants' Motion for Summary Judgment [Dkt #72];

(3)  Defendants' Motion to Strike Affidavits Associated with Plaintiff's Brief

Opposing Defendants' Motion for Summary Judgment [Dkt #90];

(4)  Defendants' Motion to Strike Plaintiff's Untimely "Initial Disclosure" to Include

New Witness [Dkt #77]; and

(5)  Defendants' Motion for Sanctions and Protective Order [Dkt #65].

The matters have been fully briefed.

For the reasons stated, the Court **DENIES** Plaintiff's Motion for Partial Summary

Judgment, **GRANTS** Defendants' Motion for Summary Judgment, **GRANTS IN PART**

and **DENIES IN PART** Defendants' Motion to Strike Affidavits Associated with Plaintiff's Brief Opposing Defendants' Motion for Summary Judgment, **DENIES** Defendants' Motion to Strike Plaintiff's Untimely "Initial Disclosure" to Include New Witness, and **DENIES** Defendants' Motion for Sanctions and Protective Order.

## II.   BACKGROUND

### A.   Definitions

As a preliminary matter, the Court defines the following acronyms mentioned throughout this Order:

"ABM" refers to Area Business Manager.

"AFT" refers to Assurance of Fair Treatment Review.

"CCC" refers to Copy Clearance Committee.

"DM" refers to District Manager.

"FCR" refers to Field coaching Report.

"FDA" refers to the United States Food and Drug Administration.

"HR" refers to Human Resources.

"NIMH" refers to the National Institute of Mental Health.

"PSDM" refers to Psychiatry Specialty District Manager.

"PSM" refers to Psychiatry Specialty Manager.

"STAR*D" refers to the NIMH-funded Sequenced Treatment Alternatives to Relieve Depression Study.

### B.   Overview

Plaintiff Susan Goldfaden brings this sex discrimination action against her former

2

employer, Wyeth Laboratories, Inc. ("Wyeth"), and her former supervisor, Robert

Monovich ("Monovich").  She alleges she was disciplined based on a subordinate

employee's false charges, and constructively discharged, because of her gender.

Goldfaden began her employment with Wyeth in 1982.  She advanced over the

years, and in February 2002, was promoted to PSDM.  As a PSDM, Goldfaden provided

direct supervision for 10 PSMs, whose role it was to increase the sale of Wyeth

products in an assigned territory.  Goldfaden spent much of her time in the field with her

PSMs, coaching and developing their product knowledge, selling skills, and analytical

skills.  Goldfaden also was responsible for ensuring that her PSMs understood and

abided by all Wyeth policies.

Because the pharmaceutical industry is heavily regulated and subject to fines for

violations, Wyeth adopted various policies to ensure that its employees comply with the

laws, rules and regulations governing the sale and marketing of pharmaceutical

products.  One such policy, Policy 511, prohibits the use of (1) off-label promotion (off-

label promotion is the prohibited practice of promoting a drug for uses that are not

included in the product's package insert, including the promotion of a drug for an

indication or dosage not in the package insert); (2) discussions about non-FDA

approved products; and (3) promotional materials that are not approved by Wyeth's

CCC.  All Wyeth employees are required to report possible violations of Policy 511.

Defendant Monovich was Goldfaden's supervisor and the ABM for the Midwest

Business Unit.  Monovich supervised 12 DMs, and collectively with the DMs, also

supervised approximately 108 sales representatives.

On February 28, 2006, Goldfaden called Monovich to report that one of her

3

PSMs, Sean Cleveland, violated Wyeth policy during a field ride the previous day by (1) having an unapproved discussion about the on-going STAR*D clinical study, (2) speaking "off-label" with a physician about the dosing of patients in excess of FDA approved levels, and (3) discussing a pipeline product (a product not yet approved by the FDA).  Monovich directed Goldfaden to thoroughly document the field ride.

On March 1, 2006, Goldfaden prepared a FCR, in which she documented Cleveland's violations of Policy 511.  (An FCR is an internal form Wyeth uses to rate a sales representative's overall performance and objectives for a field visit.  The form includes comment sections for the manager and the employee being evaluated).  Goldfaden then emailed the FCR to Cleveland for his review and signature.  Per Wyeth policy, each FCR must be signed by the sales representative and the DM before it is submitted to the ABM.  Ordinarily, the sales representative signs and returns the FCR on the next day, or as quickly as possible, to ensure accuracy.  However, Cleveland had not done so by March 5, 2006, so Goldfaden again emailed him to request that he sign and submit the FCR.

On March 6, 2006, Cleveland called Monovich to admit that he violated policy, but said Goldfaden encouraged him to discuss STAR*D.  He added that he was in conflict about Goldfaden's coaching, because he witnessed her discuss pipeline products with physicians during field rides, and thought it was okay for him to do so.  Cleveland also told Monovich he was fearful of Goldfaden, because she had warned that she could have him demoted or terminated at any time.

Neither Monovich, nor Cleveland told Goldfaden about their discussion.  Goldfaden alleges that Cleveland delayed responding to the FCR until he could talk to

4

Monovich.  She further alleges that Monovich and Cleveland concocted a false story that she directed Cleveland to violate Wyeth policy and federal law.  Monovich denies this contention.

On March 7, 2006 at 7:23 a.m., Goldfaden again emailed Cleveland to request that he return the FCR.  Cleveland finally responded for the first time at 11:54 p.m., to say he had been unable to open the FCR, but was now sending it.  Goldfaden either did not receive the FCR from Cleveland or could not open it, and on March 8, 2006, again emailed him to request the FCR.

Cleveland re-sent the FCR to Goldfaden on March 8, 2006 at 9:50 p.m.  That same evening, Goldfaden sent the completed FCR to Monovich.  In the "Meeting Job Requirements" section of the FCR, Goldfaden stated that Cleveland committed a "major violation of Good Promotional Practices policy 511."  In the "Employee Comments" section, Cleveland reported there was "miscommunication" from Goldfaden with regard to approved and unapproved materials, and that his plan to discuss STAR*D during the sales call was discussed with Goldfaden beforehand.

On March 14, 2006, Monovich emailed the FCR to Wyeth's Compliance Office ("Compliance") for possible investigation, due to Goldfaden's violation report and Cleveland's counter-allegation.  In the email, Monovich emphasized Goldfaden's history of excellence and prior awards.  (Goldfaden received overall performance evaluations of "4" (Exceeds Expectations) in 2003, 2004 and 2005.  In 2005, she was named District Manager of the Year).

Compliance began an investigation, conducted by Senior Compliance Officer Jeff Cohen and Investigator Rodney Jones.  Cleveland and Goldfaden were interviewed on

April 4, 2006.  From April 5 through April 13, 2006, Compliance interviewed Cleveland's prior DM, Joel Vernier, and nine PSMs who reported to Goldfaden.  They also re-interviewed Cleveland and Goldfaden.  Cleveland turned over notes he had written detailing his issues with Goldfaden over a 10-month period.  On May 10, 2006, Jones completed an 18-page report summarizing the investigation ("Compliance Report").

The Compliance Report noted that Goldfaden presented her PSMs with a great deal of detailed information about studies, pipeline products, and other information that could not be used by the PSMs during sales calls.  The Compliance Report's conclusions were that Goldfaden (1) admitted she knew of Cleveland's intent to discuss the STAR*D study in advance of his meeting with physicians, and (2) very clearly felt that her employees were permitted to use the STAR*D materials in a limited fashion.  Goldfaden says these conclusions are false and incorrect.

Based on its investigation, Compliance also concluded that Goldfaden's management practices should be investigated.  Compliance forwarded Cleveland's notes, their interview notes, and a copy of the Compliance Report to Lydia Rohn, Senior Employee Relations Consultant.  Rohn later spoke to Cohen, who gave her an overview of Compliance's investigation.

On May 11, 2006, Monovich, Rohn, Cohen, Jones, Zone Vice President Bill Campbell, and in-house Labor and Employment counsel Donna Orzell, participated in a "close-out" conference call regarding the investigations of Cleveland and Goldfaden. During the meeting, it was determined that Cleveland would receive a Warning Letter and be required to re-take training on Policy 511.  His 2006 Performance Appraisal was limited to a year-end evaluation of "3 - At Expectations."  Action on Goldfaden was

deferred pending the outcome of the investigation into her managerial practices.

On May 24 and June 20, 2006, Rohn interviewed Goldfaden, Cleveland and five other PSMs regarding Goldfaden's management practices.  Cleveland said Goldfaden ruled by fear, and he felt threatened from day one that he could be demoted or terminated if he "got on her bad side."  Cleveland's partner, Penny Yost, reported that Cleveland was a quality rep, but Goldfaden seemed "very critical of him" and had "flown off the handle with him."  She never witnessed an incident firsthand, but learned of various incidents from talks with Cleveland.  The other PSMs reported having a good relationship with Goldfaden, although several heard rumors about a former PSM being systematically pushed out by Goldfaden.

During her interview with Rohn, Goldfaden stated she was being retaliated against for reporting Cleveland's violation of policy.  Specifically, Goldfaden said (1) Cleveland's report of her alleged violations was retaliatory, (2) the long duration of the investigations caused her extreme stress and interrupted her work, and (3) Monovich chose to participate in promotional interviews of PSM candidates, when he had not done so in the past.

HR Specialist, Meredith Keilty, conducted a separate investigation as a result of Goldfaden's retaliation claims.  Keilty spoke with Goldfaden and Monovich, who explained that he became more involved in the interview process as a precaution, in the event that Goldfaden was demoted as a result of compliance infractions.  Keilty conducted no further interviews, since there was no conflict in the facts reported by Goldfaden and Monovich.  Keilty's investigation concluded there was no evidence to support Goldfaden's retaliation claims.

7

On August 29, 2006, Monovich, Campbell, Cohen, Jones, Rohn and Orzell held a "close-out" conference to discuss the claims against Goldfaden. Cohen recommended that Goldfaden be terminated; Campbell, Monovich and Rohn argued against termination. Ultimately, they determined that Goldfaden violated Policy 511 and HR Policy 2006, and would receive a Warning Letter. Like Cleveland, she was required to re-take training on Policy 511 and her 2006 Performance Appraisal was limited to a year-end evaluation of "3 - At Expectations."

On September 12, 2006, Monovich delivered the Warning Letter to Goldfaden, in a meeting also attended by Rohn. During the meeting, the parties discussed how to support and encourage the managerial-subordinate relationship between Cleveland and Goldfaden going forward. Goldfaden says she also requested to speak with Campbell about the warning letter. By chance, she saw Campbell the next day and mentioned to him that she wanted to talk about the warning letter. Campbell did not recall this encounter.

Two weeks later, Goldfaden says she told Monovich she wished to exercise her right to an AFT review with Campbell. (An AFT review is an appeal to higher management when treatment is perceived as unfair or inequitable. A current or former employee may request an AFT review within six months of an action or decision). Monovich denies this contention, but admits calling Campbell on Goldfaden's behalf to get a meeting on his agenda. Goldfaden herself never called Campbell, HR, or anyone in higher management in order to request an AFT review, as specified in the AFT policy.

On September 29, 2006, Goldfaden interviewed with Schering-Plough ("Schering"), a competitor pharmaceutical company. On October 2, 2006, Schering

8

offered Goldfaden the position of District Manager for Hospitals.  After consulting with her accountant regarding the compensation package, Goldfaden further negotiated the terms and accepted Schering's offer.  On October 13, 2006, Goldfaden resigned from Wyeth, with an effective date of October 27, 2006.

Goldfaden filed this action against Wyeth and Monovich.  Her Amended Complaint alleges: Count I - Sex Discrimination under Title VII of the Civil Rights Act of 1964 ("Title VII") (Wyeth Only); Count II - Sex Discrimination under the Michigan Elliott Larsen Civil Rights Act ("ELCRA"); Count III - Breach of Contract/Legitimate Expectations; and Count IV - Public Policy Tort.  Goldfaden claims she was slated to receive a significant raise, stock options, sales award, and bonus, based on her district's excellent sales performance (i.e., rated number 1 of 7 districts in her zone and 1 of 23 districts in the nation).  She says those opportunities were lost as a result of the warning letter, which she asserts constituted a constructive discharge.  Defendants move for summary judgment on all claims.

## III.    STANDARD OF REVIEW

Under Fed. R. Civ. P 56(c), summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  *Copeland v. Machulis*, 57 F.3d 476, 478 (6th Cir. 1995).  A fact is "material" and precludes a grant of summary judgment if "proof of that fact would have [the] effect of establishing or refuting one of the essential elements of the cause of action or defense asserted by the parties, and would necessarily affect application of appropriate principle[s] of law to the rights and

9

obligations of the parties." *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984).

The court must view the evidence in the light most favorable to the nonmoving

party and it must also draw all reasonable inferences in the nonmoving party's favor.

*Cox v. Kentucky Dept. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995).  Nevertheless, the

nonmoving party must do more than simply show there is some metaphysical doubt as

to the material facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,

586, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986).  The mere existence of a scintilla of

evidence in support of the nonmoving party's position is not sufficient to create a

genuine issue of material fact.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 91

L. Ed. 2d 202, 106 S. Ct. 2505 (1986).  The proper inquiry is "whether the evidence

presents a sufficient disagreement to require submission to a jury or whether it is so

one-sided that one party must prevail as a matter of law." *Id.* at 251-52.

## IV.    CASE LAW AND ANALYSIS

### A.    Motion to Strike Plaintiff's Affidavits

Defendants move the Court to strike, in whole or in part, the following affidavits

associated with Plaintiff's Brief in opposition to their motion for summary judgment: (1)

Lariesa Croft; (2) Carrie Porter; (3) Michael Collins; (4) Jeffrey Hicks; (5) Michele

Thatcher; and (6) Susan Goldfaden.  Defendants say the affidavits violate the

requirements of Fed. R. Civ. P. 56(e)(1), that affidavits be made on personal knowledge

and/or set forth facts that would be admissible in evidence.

Plaintiff argues the Motion is an attempt to purge the record of facts or opinions

contrary to the arguments raised in Defendants' motion.  She says the facts and

opinions contained in the affidavits are rationally based on each affiant's perception and

personal knowledge, and therefore, are admissible.

Rule 56(e) sets the standards which supporting or opposing affidavits to a motion for summary judgment must satisfy, but the rule makes no provision for "striking" documents which may not conform:

> A supporting or opposing affidavit must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated. If a paper or part of a paper is referred to in an affidavit, a sworn or certified copy must be attached to or served with the affidavit. The court may permit an affidavit to be supplemented or opposed by depositions, answers to interrogatories, or additional affidavits.

Fed. R. Civ. P. 56(e).

Rule 12 allows the Court on its own motion, or on the motion of a party, to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f).

The Court addresses each affidavit.

**1. Lariesa Croft**

Defendants argue this affidavit (1) seeks to introduce inadmissible character evidence, which is excluded under Fed. R. Evid. 404(a); (2) is not relevant; (3) lacks foundation; (4) lacks personal knowledge; and (5) is based on inadmissible hearsay. Specifically, they cite to paragraph 4, in which Croft says Defendant Monovich "had no respect for women in the workplace."

While the Court agrees that character evidence is inadmissible, Fed. R. Evid. 404(a), evidence of other incidents of discrimination is not inadmissible character evidence because such evidence would be admissible to prove intent. Fed. R. Evid. 404(b). The affidavit of Lariesa Croft meets this threshold.

11

In her affidavit, Croft states that Monovich was her supervisor and she observed him engage in conduct which led to her opinion that "he had no respect for women in the workplace" and that he treated "women more harshly than men." Dkt # 82, ¶¶ 4, 22. She describes several incidents in which she was present or involved.  She has personal knowledge of the incidents, her opinions are based on her own perceptions, and her testimony would be relevant and admissible at trial.

Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact. Fed. R. Evid. 704(a).  Federal Rule of Evidence 701 permits lay testimony concerning opinions and inferences that are (1) rationally based on the perception of the witness; (2) helpful to a clear understanding of the witness' testimony; and (3) not based on scientific, technical or other specialized knowledge within the scope of Rule 702.

The Sixth Circuit and Michigan courts hold that it is not error to allow a lay witness to express an opinion regarding discrimination in an employment setting, as long as the opinion complies with the requirements of Rule 701. See *Miller v. Alldata Corp.,* 14 Fed. Appx. 457, 465 (6th Cir. 2001) (unpublished); *Torres v. County of Oakland, Mich.*, 758 F.2d 147, 149-50 (6th Cir. 1985); *Wilson v. General Motors Corp.*, 183 Mich. App. 21, 35, 454 N.W.2d 405, 413 (1989).

The Court **DENIES** the Motion to Strike Croft's affidavit, in whole or in part.

### 2.  Carrie Porter

Defendants argue this affidavit (1) seeks to introduce inadmissible character evidence, which is excluded under Fed. R. Evid. 404(a); (2) is not relevant; and (3)

lacks personal knowledge.

Again, Carrie Porter, a current Wyeth employee and former subordinate of Goldfaden and Monovich, discusses her experiences working for them.  In particular, Porter describes an interview with Monovich in which he allegedly made sexist comments to her.  Porter has personal knowledge of the incidents, her opinions are based on her own perceptions, and her testimony would be relevant and admissible at trial. *Miller,* 14 Fed. Appx. at 457.

The Court **DENIES** the Motion to Strike Porter's affidavit, in whole or in part.

### 3.  Michael Collins

Defendants argue this affidavit is not relevant.

Plaintiff alleges she was treated differently than similarly situated men who violated Wyeth policy.  In his affidavit, Collins, a current Wyeth employee, admits that he used a highlighted antibiogram (an antibiogram is an antibiotic sensitivity report), which was not approved by Wyeth's CCC, during a sales presentation with Monovich in 2006. This evidence is relevant to Plaintiff's claim.

The Court **DENIES** the Motion to Strike Collins' affidavit, in whole or in part.

### 4.  Jeffrey Hicks

Defendants argue this affidavit (1) seeks to introduce inadmissible character evidence, which is excluded under Fed. R. Evid. 404(a); (2) is not relevant; (3) lacks foundation; and (4) lacks personal knowledge.

Hicks, a former Wyeth employee and subordinate of Goldfaden and Monovich, discusses his experiences working for them.  He specifically describes a January 2006

13

meeting in Grand Rapids, where he attended an educational program about the STAR*D study, and his training and knowledge regarding the use of such information during sales calls.  He also describes his interactions with Goldfaden and Monovich, and his observations regarding their respective management styles.  Lastly, he discusses his knowledge of Wyeth's disciplinary policy and the effect of receiving a warning letter.  Hicks has personal knowledge of the topics, his opinions are based on his own perceptions, and his testimony would be relevant and admissible at trial. *Miller,* 14 Fed. Appx. at 457.

The Court **DENIES** the Motion to Strike Hicks' affidavit, in whole or in part.

### 5.  Michele Thatcher

Defendants argue this affidavit (1) is not relevant and (2) lacks foundation.

In her affidavit, Michele Thatcher, a Wyeth Medical Science Liaison from 2000 to 2004, discusses her knowledge of Wyeth Policy 511 and its compliance rules, and in particular, whether sales representatives may engage in general discussions with customers regarding government sponsored medical studies.  This subject is relevant because Plaintiff alleges that such discussions are generally permissible as long as the sales representative does not provide details about the study.  However, Thatcher, who left Wyeth in 2004, lacks personal knowledge of Wyeth policies in 2006.

The Court **GRANTS** the Motion to Strike Thatcher's affidavit.

### 6.  Susan Goldfaden

Defendants argue that Plaintiff's affidavit (1) seeks to introduce inadmissible character evidence, which is excluded under Fed. R. Evid. 404(a); (2) is not relevant; (3)

lacks foundation; (4) lacks personal knowledge; and (5) is based on inadmissible hearsay.

While the Court agrees that character evidence is inadmissible, Fed. R. Evid. 404(a), Goldfaden's affidavit describes several incidents in which she was present or involved.  She has personal knowledge of the incidents, her opinions are based on her own perceptions, and her testimony would be relevant and admissible at trial.

Even so, to the extent Plaintiff's affidavit includes information based on her beliefs, or speculates about what she lost as a result of the warning letter, she lacks foundation and personal knowledge on those matters, and it should be excluded.  The Court **GRANTS IN PART** and **DENIES IN PART** the motion to strike Goldfaden's affidavit

### B.  Sex Discrimination - Title VII and ELCRA

### 1.  *Prima Facie* Case

Plaintiff's Title VII claim is against Wyeth only; her ELCRA claim is against Wyeth and Monovich.  Title VII renders it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

The ELCRA also makes it unlawful for an employer to discriminate against an employee or prospective employee on the basis of gender. See M.C.L. §37.2202(1)(a). Claims of discrimination brought pursuant to the ELCRA are analyzed under the same evidentiary framework as claims of discrimination brought under Title VII. See *Jackson*

*v. Quanex Corp.*, 191 F.3d 647, 658 (6th Cir. 1999).

Because Plaintiff does not offer direct evidence of discrimination, the Court's analysis is governed by the familiar burden-shifting framework set forth in *McDonnell-Douglas Corp. v. Gen.*, 411 U.S. 792, 802 (1973), and refined in *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254, 67 L. Ed. 2d 207, 101 S. Ct. 1089 (1981)).  Under that analysis, Plaintiff must first establish a *prima facie* case of sex discrimination.

In order to establish a *prima facie* case under both statutes, Plaintiff must produce evidence sufficient to show that (1) she is a member of the protected class, (2) an adverse employment action was taken against her, (3) she was qualified for the position, and (4) she was replaced by a male or a similarly situated male was treated better. *DiCarlo v. Potter*, 358 F.3d 408, 415 (6th Cir. 2004) (citing *Talley v. Bravo Pitino Rest., Ltd.*, 61 F.3d 1241, 1246 (6th Cir. 1995)).  A plaintiff who establishes a *prima facie* case of discrimination receives the benefit of a presumption that the employer unlawfully discriminated against her. *Id.* at 414 (citing *Burdine,* 450 U.S. at 254)

If the plaintiff successfully establishes a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. *Id.* (citing *Burdine*, 450 U.S. at 253; *McDonnell Douglas,* 411 U.S. at 802).  Should the defendant carry this burden, the plaintiff must then prove by a preponderance of the evidence that the defendant's proffered reasons were not its true reasons, but were a pretext for discrimination. *Id.*  At all times, the plaintiff bears the ultimate burden of proving that unlawful discrimination took place. *Id.*

Defendants don't dispute that Plaintiff is a member of a protected class or that

16

she was qualified for her position.  However, they say they are entitled to summary judgment because Plaintiff cannot show that she suffered an adverse action or that she was treated differently than similarly situated males.  Plaintiff counters that while Defendants did not fire her, they constructively discharged her by issuing the warning letter.  She urges the Court to find that she suffered an adverse action and grant partial summary judgment in her favor on that sole issue.  She also says she presents sufficient evidence that she was treated differently than similarly situated men.

### a.  Adverse Action

A plaintiff may establish an adverse employment action by demonstrating that she was constructively discharged. See *Kocsis v. Multi-Care Mgmt.*, 97 F.3d 876, 886-87 (6th Cir. 1996).  To demonstrate a constructive discharge, Plaintiff must adduce evidence to  show that (1) "the employer . . . deliberately created intolerable working conditions, as perceived by a reasonable person," and (2) the employer did so "with the intention of forcing the employee to quit . . . ." *Moore v. Kuka Welding Sys.*, 171 F.3d 1073, 1080 (6th Cir. 1999).

"To determine if there is a constructive discharge, both the employer's intent and the employee's objective feelings must be examined." *Id.* (citing *Held v. Gulf Oil Co.*, 684 F.2d 427, 432 (6th Cir. 1982)).  A plaintiff must demonstrate not only intent, but also "other aggravating factors," demonstrating a continuous and severe pattern of discrimination. *Yates v. Avco Corp.*, 819 F.2d 630, 637 (6th Cir. 1987).

As articulated by the Sixth Circuit:

Whether a reasonable person would have felt compelled to resign depends on the facts of each case, but [the court] consider[s] the following factors relevant, singly or in combination: (1) demotion; (2) reduction in salary; (3) reduction in job

responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status.

*Logan v. Denny's*, 259 F.3d 558 (6th Cir. 2001) (citing *Brown v. Bunge Corp.*, 207 F.3d 776, 782 (5th Cir. 2000).

Plaintiff claims she was constructively discharged and a jury should decide whether a reasonable person in her shoes would have felt compelled to resign. She asserts that her work situation was untenable because Monovich ordered her to resume supervising Cleveland after the investigation, despite his false claims against her, and directed her not to take any retaliatory action against Cleveland. She also says the "3" rating meant she would receive a lower salary increase and other compensation, and would affect her career advancement for at least one year. And, she claims she lost valuable pension benefits when she left the company after 24 years. The Court finds that Plaintiff's allegations and supporting evidence fall short of establishing the elements of a constructive discharge.

Plaintiff does not allege she was demoted, and she did not receive any reduction in salary, job responsibilities or assignments. She does not allege any other aggravating factors demonstrating a continuous and severe pattern of discrimination. Likewise, she does not allege she suffered any harassment or badgering calculated to make her resign. Instead, Plaintiff appears to have become frustrated with her work situation and resigned voluntarily.

Unless conditions are beyond "ordinary" discrimination, a complaining employee is expected to remain on the job while seeking redress. *Perry v. Harris Chernin, Inc.*,

18

126 F.3d 1010, 1015 (7th Cir. 1997), cited in *Pennsylvania State Police v. Suders*, 542 U.S. 129, 147, 124 S. Ct. 2342, 159 L. Ed. 2d 204 (2004). Plaintiff's evidence does not establish that her working conditions were so unbearable that she could not have remained on the job while pursuing available remedies, such as an AFT review.

Additionally, Plaintiff alleges her receipt of the warning letter, in itself, constituted an adverse employment action. She directs the Court's attention to *Vargas v. Puerto Rican American Ins. Co.*, 52 F. Supp. 2d 305, 312 (D. P.R. 1999), *Unrein v. Payless Shoesource, Inc.*, 51 F. Supp. 2d 1211 (D. Kan. 1999), *Johnson v. DiMario*, 14 F. Supp. 2d 107, 100 (D. D.C. 1998), *Fowler v. Sunrise Carpet Indus., Inc.*, 911 F. Supp. 1560, 1583 (N.D. Ga 1996), and *Gold v. Gallaudet College*, 630 F. Supp. 1176, 1187 (D. D.C. 1986), in support of this contention.

In *Johnson*, the court found that a written reprimand placed in the plaintiff's personnel file was an adverse action sufficient to establish a *prima facie* case of retaliation. *Johnson,* 14 F. Supp. 2d at 312-313. But, because the court did not discuss whether the defendant rebutted the *prima facie* case, the case is marginally instructive.

In *Unrein*, the plaintiff claimed she was retaliated against for making a discrimination complaint, when her employer issued a written reprimand regarding inconsistencies in a subordinate's time sheets and actual hours worked. The reprimand advised the plaintiff that she could be terminated in the event of a recurrence, and came only one week after she complained about a male employee's promotion to a new position for which she had expressed interest. The court found that the written reprimand constituted an adverse employment action, but that the plaintiff could not sustain her claim because she failed to produce evidence that other employees who

19

engaged in similar conduct did not receive the discipline she received. *Unrein,* 51 F. Supp. 2d at 1211.

In *Vargas*, the plaintiff claimed his employer retaliated against him for filing an age discrimination claim, by issuing a memorandum ordering him to stop practicing medicine at work and investigating a co-worker's sexual harassment complaint.  The co-worker was unaware of the plaintiff's age discrimination claim, and the investigation of her sexual harassment complaint culminated in a memorandum to the plaintiff that he inadvertently created a hostile environment and could be fired if he again engaged in such conduct.  The court determined that the employer's conclusion regarding sexual harassment and its warning to the plaintiff, was a sufficiently severe disciplinary action to constitute an adverse employment action. *Vargas*, 52 F. Supp. 2d at 313.  Even so, because there was no evidence that the co-worker's complaint or the employer's investigation was a sham, and because there was nothing to indicate the employer sent the memorandum as a means of retaliation, the evidence was insufficient to support a retaliation claim. *Id*. at 315.

In *Gold*, the plaintiff claimed she was discriminated against when her supervisor reprimanded her for excessive use of the telephone.  She also had been cited for the same conduct by a prior supervisor.  In response to the latest reprimand, the plaintiff stated that she took full responsibility.  The court was "willing to accept" that the reprimand was an adverse action, but concluded it was a legitimate exercise of supervisory authority, handled in a manner that belied the plaintiff's claim of discriminatory animus. *Gold*, 630 F. Supp. at 1185-1187.

Lastly, in *Fowler*, the plaintiffs alleged their employer issued written reprimands

20

to them in retaliation for filing a sexual harassment action, because they asked other employees to talk to their lawyers about the case.  The reprimands, which informed the plaintiffs that other employees felt intimidated and that future violations would result in immediate discharge, were later withdrawn and removed from the plaintiffs' personnel files.  The court concluded that such a threatening reprimand, even though later rescinded, qualified as an adverse employment action for purposes of a retaliation claim. *Fowler*, 911 F. Supp. at 1583.  The court noted that "once an unmistakable threat of termination has been made by an employer, the withdrawal of the threat does not necessarily remove the chilling effect that threat has upon an employee's protected speech." *Id.*

Notably, all of Plaintiff's cited cases are from courts outside this district, and were rejected by the court in *Wetter v. Quigley*, 1999 U.S. Dist. LEXIS 15683, at *13 (W.D. Mich. Oct. 4, 1999).  That court concluded that under Sixth Circuit precedent, an adverse employment action must involve some change in salary, work hours or responsibility. *Id.* citing *Primes v. Reno*, 190 F.3d 765, 1999 U.S. App. LEXIS 21936, 1999 WL 705550, at *3 (6th Cir. 1999) (plaintiff's mid-range performance evaluation of "fully successful"--is not the type of adverse employment action contemplated by Title VII. "If every low evaluation or other action by an employer that makes an employee unhappy or resentful were considered an adverse action, Title VII would be triggered by supervisor criticism or even facial expressions indicating displeasure."); *Hollins v. Atlantic Co. Inc.*, 188 F.3d 652, 1999 U.S. App. LEXIS 18755, 1999 WL 615487, at *8 (6th Cir. 1999) (affirming the district court that plaintiff's lowered ratings do not establish an adverse employment action); and *Rabinowitz v. Pena*, 89 F.3d 482, 488-489 (7th Cir.

21

1996) (low performance evaluation and consequent ineligibility for discretionary bonus not actionable employment action).

Similar to this case, the plaintiffs in *Wetter* alleged they suffered an adverse action after receiving a written reprimand for violating a company record keeping policy. One plaintiff quit her job four months after receiving the reprimand and claimed she was constructively discharged; the other was terminated eight months after receiving the reprimand, for secretly tape recording conversations with her manager.  The plaintiffs said they were subjected to harassment, fault-finding and emotional distress after the reprimands, and that younger employees routinely made similar record keeping errors and were not given written reprimands.  Even though the reprimands could have affected the plaintiffs' future employment, the court concluded they had not experienced an adverse action. *Wetter*, 1999 U.S. Dist. LEXIS 15683, at *13.

Here, Plaintiff complains the warning letter would have affected her raise, bonus and stock options, but she does not allege or present evidence that she was automatically entitled to receive a certain raise, bonus or stock options, or that she would not have received any raise.  She offers the 2001 Merit Guide Guideline as evidence that she would have received a higher raise.  However, that Guideline specifically states that it is a guide for managers regarding individual salary increase recommendations and actual recommendations may vary.  The range for a "3" rating is 1.5% to 5.0%, a "4" rating is 2.0% to 7.0%, and a "5" rating is 3.0% to 8.0%, so there is a significant degree of overlap. See Dkt. #88, Pl. Reply, Exh. B.

More importantly, employee raises, sales awards and stock options are calculated based on performance through the end of the year.  When Plaintiff resigned

in October, no recommendation had been made with respect to any employee's raise, bonus, or stock options, and thus those benefits had not yet accrued.  And, once she quit, Plaintiff became ineligible for all sales awards and future pension benefits.  Any complaint about the warning letter is premature or moot. *Hardy v. Potter*, 191 F. Supp. 2d 873, 883 (E.D. Mich 2002).

To the extent Plaintiff claims she was constructively discharged, the Court rejects that claim. See *Smith v. Henderson*, 376 F.3d 529 (6th Cir. 2004) (the manner in which an employer supervises an employee or criticizes his job performance is normally insufficient to establish a constructive discharge as a matter of law).  Likewise, the Court concludes the warning letter was not an adverse employment action, and that Plaintiff fails to meet the second prong of her *prima facie* case.

### b.  Similarly Situated

"[T]o make a comparison of a discrimination plaintiff's treatment to that of [non-protected employees], the plaintiff must show that the "comparables" are similarly-situated in all respects." *Mitchell v Toledo Hosp.*, 964 F. 2d 577, 583 (6th Cir. 1998).  To be deemed "similarly situated," the individuals with whom the plaintiff seeks to compare her treatment must have: (1) dealt with the same supervisor; (2) been subject to the same standards; and (3) engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it. *Id*.

Plaintiff claims that Monovich did not like women who challenged or disagreed with him, and generally treated women differently, or more harshly, than similarly situated male employees.

As evidence of discriminatory intent, Plaintiff proffers Carrie Porter's 2004 interview with Monovich for a promotion to an open DM position.  During the interview, Monovich reportedly told Porter he was concerned that she could not handle the position because she was a working mother and preferred not to relocate, and he was afraid she would burn out.  Monovich admits he asked Porter whether the timing was right since she had young children and parenting responsibility.  Plaintiff says the fact that Monovich did not ask that question of any male candidates demonstrates his bias towards women.

However, unlike Plaintiff, who was a DM responsible for supervising an entire sales team, Fisher was a PSM who worked under Plaintiff and Monovich.  Furthermore, Fisher is married with children, while Plaintiff is single and has no children.  No similar comparison can be made between the two.  Moreover, other than this one arguably offensive comment, Plaintiff offers no other incidents of explicitly gender-based conduct. Mere offensive utterances are not actionable under Title VII. *Harris v. Forklift Sys.*, 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993).

Plaintiff next proffers a 2009 incident involving Rebecca Eicher, in which she interrupted Monovich when he responded to a question during her presentation to the sales team.  Plaintiff says Monovich later berated Eicher and reduced her to tears. Plaintiff cites Eicher's deposition testimony in which Eicher says Monovich called her unprofessional and criticized her dress and appearance.  Plaintiff asserts that this incident shows that Monovich is sexist.

However, the evidence does not establish that Monovich chastised Eicher because of her gender.  Eicher testified that Monovich complimented her and gave her

24

a "Caught You Doing It Right" form, then voiced disapproval about her body language during the presentation.  Monovich told Eicher it was unprofessional the way she wrapped her sweater around herself and bent over a table during the presentation. Those criticisms are gender-neutral.

Plaintiff also proffers a 2009 incident involving Nikole Fine and Melissa Handler, in which they complained about a training session at a sales meeting.  Fine testified that 10 days after the meeting, her manager, Max Schmaler, gave her a "2" rating on a FCR at Monovich's request, because Monovich viewed her behavior and attitude as "cancerous" and unprofessional.  Handler testified that a week or so later, Schmaler had the same conversation with her and gave her a "2" rating on her FCR.  Plaintiff says this is another instance of Monovich applying a different set of rules for the men and women he supervised.

However, Plaintiff offers no evidence regarding any males who engaged in similar conduct and were not given a lower rating.  In Handler's FCR, Schmaler stated that "when others made comments and suggestions you dismissed their remarks either verbally or with your body language.  You have a right to express your opinions and disagree but this must be done with respect to others."  Those criticisms are gender neutral.

Plaintiff also proffers two incidents which she says demonstrate that Monovich treated male employees more favorably than female employees.  First, Plaintiff says that Monovich reported Melissa Handler to Compliance and gave her a warning letter for showing an approved highlighted reprint to a physician during a sales call, but did not discipline Michael Collins for showing a physician an unapproved highlighted

antibiogram.

The proffered evidence shows that Handler, Collins and Plaintiff were not similarly situated.  Handler testified that she admittedly, though inadvertently, showed a highlighted reprint to a physician, which was a violation of Wyeth policy. See Dkt. #83, Pl. Resp., Exh. 7.  Monovich, on the other hand, said that an antibiogram was not a reprint, and at the time Collins used it, it was unclear whether that was a violation of policy.  As a precaution, Monovich told Collins he should not use it. See Dkt. #87, Def. Reply, Exh. 41.  Plaintiff's evidence actually corroborates Monovich's version of events. Although the antibiogram was not CCC-approved, Collins testified that Monovich didn't know whether he could use the antibiogram, and told him he shouldn't use it. See Dkt. #83, Pl. Resp., Exh. 7.

Plaintiff offers no evidence of a male district manager who was not disciplined after a determination that he violated policy or provided erroneous information to a representative.  Monovich, however, testified that he issued a warning letter to at least one male DM, Scott Segall, who provided bad advice that led to a policy violation by one of his representatives.  It is Plaintiff's burden to produce specific facts showing that both she and a similarly situated male engaged in the same conduct and were treated differently. *Mitchell*, 964 F.2d at 583.

Second, Goldfaden complains Monovich did not discipline Dave Skibicki when Skibicki falsely accused her of being a racist and discriminating against a black sales representative.  The evidence shows that Monovich contacted HR for guidance, conducted an investigation, and verbally reprimanded Skibicki at HR's behest when the allegations were found to be false; he did not contact Compliance because it was not a

26

policy violation.  Furthermore, when Goldfaden requested that a written document go into the file to show Skibicki's allegations were unsubstantiated, Monovich agreed and again contacted HR for guidance.  Plaintiff offers no evidence that Monovich did not treat male managers in a similar fashion.

The Court concludes that Plaintiff failed to establish that she was treated differently than similarly situated males, and hence, does not establish a *prima facie* case.

### c. Pretext

Even if Plaintiff could make out a *prima facie* case, she cannot show that Defendants' non-discriminatory reason for issuing the warning letter was pretextual. Defendants say they issued the warning letter, because Plaintiff violated Policy 511 by directing sales representatives that they could initiate discussions with customers about non-CCC approved materials, such as STAR*D.  Plaintiff says she did not tell her PSMs that they could use non-CCC approved materials, and it was not a violation of Policy 511 to generally discuss the STAR*D study during sales calls.   She contends that the Compliance Report's contrary findings and the warning letter were a pretext to hide gender-based discrimination.  This claim is not supported by the evidence.

Wyeth's Policy 511 says that "[a]ll promotional materials must be approved by a Wyeth CCC prior to use." See Def. Motion, Exh. 9.

Wyeth's Policy 511 Frequently Asked Questions explains:

Q16.  If a sales representative sees a newspaper or magazine article, can they mention the article to our customers? How should they respond if a customer asks them if they saw a particular article in a newspaper or magazine?

A16.   Only items that have been CCC-approved for promotion can be used to promote Wyeth products . . .  Sales representatives may respond to questions with a CCC-approved response if available.  However, they may not initiate promotional discussions about non-CCC approved materials . . .

Q17.   When is it acceptable for sales representatives to discuss or promote a product for uses that are not within product labeling?

A17.   Never.  Wyeth employees and agents may not engage in any "off label promotion" . . .  If a healthcare professional presents an issue or asks a question that requires a response that is outside the product labeling, the correct response is to complete a Request for Product Information (RPI).  Wyeth employees and agents may not encourage or solicit such requests. *Id.*

The policy further instructs that:

F.   In some respects, this policy is more restrictive than what the law or industry and professional standards require.  Nevertheless, Policy 511 is our policy, and you are expected to follow it.  Any deviations from this policy may result in disciplinary action, including termination of employment. *Id.*

After receiving Goldfaden's report of Cleveland's Policy 511 violation, and Cleveland's counter-allegation of her Policy 511 violation, Wyeth conducted an extensive investigation, the results of which were detailed in an 18-page report.  The decision to issue the warning letter was made after discussion and concensus by a group of individuals, one of whom believed Goldfaden should be terminated.  The fact that Monovich argued against termination runs counter to any assertion that he unfairly influenced the decision.

Moreover, even if the group's conclusions were incorrect, Plaintiff's disagreement does not create a genuine issue of material fact.  "As long as an employer has an honest belief in its proffered nondiscriminatory reason, the employee cannot establish

28

that the reason was pretextual simply because it is ultimately shown to be incorrect."
*Majewski v. Auto. Data Processing, Inc.*, 274 F. 3d 1106, 1117 (6th Cir. 2001).

Plaintiff also claims that Monovich and Cleveland shared a bond atypical of the relationship between an ABM and a PSM, and they conspired to blame her for Cleveland's actions so Cleveland would not lose his job.  Plaintiff says the fact that Cleveland (1) waited until after he talked to Monovich to send his portion of the FCR, (2) never reported her to Monovich or the Wyeth hotline beforehand, and (3) never told her about the "secret" conversation, shows that Cleveland and Monovich hatched their story.  She claims she was a threat to Monovich, and this scheme was payback because she challenged Monovich about Cleveland's readiness for promotion at a talent review meeting.  These claims also are not supported by the evidence.

Cleveland characterized Monovich as a work acquaintance and regional manager who he respected, but not a mentor or friend.  Monovich likewise said he came to know Cleveland at sales meetings, because Cleveland was good at networking and sought to "get in front of" him more often than the majority of the sales force.  Besides those twice-a-year meetings, Monovich did not otherwise talk on the telephone with or try to mentor Cleveland.  Monovich admits that Cleveland called him about the Policy 511 violation and they talked approximately five to seven minutes.

Moreover, at talent review meetings, Monovich, an HR representative, and the district managers typically got together and voiced their opinion on which persons were suitable candidates for promotion.  At the talent review meeting in question, Scott Friend joined Goldfaden in voicing concerns about Cleveland's readiness for promotion.  Goldfaden says Monovich was visibly upset at her; Friend did not recall Monovich

29

getting visibly upset at Goldfaden.  Even if true, other than her suspicions or assertions,

Plaintiff presents no evidence to substantiate her conspiracy claim.   At this stage,

Plaintiff cannot rely upon bare assertions, conclusory allegations, or suspicions.

*Columbia Natural Res., Inc. v. Tatum*, 58 F.3d 1101, 1109 (6th Cir. 1995).

The Court **GRANTS** summary judgment in favor of Defendants on Plaintiff's Title

VII and ELCRA sex discrimination claims.

### C.  Breach of Contract/Legitimate Expectations

In Michigan, employment is presumed to be "at will," that is, terminable at the will

of the employee or the employer. *Lynas v. Maxwell Farms*, 279 Mich. 684, 687, 273

N.W. 315, 316 (1937).  This presumption is not, however, "a substantive limitation on

the enforceability of employment contracts but merely a rule of 'construction.'"

*Toussaint v Blue Cross & Blue Shield of Michigan*, 408 Mich 579, 597, 292 N.W.2d 880

(1980).  As recognized in *Toussaint*, employer policies and procedures may also

become a legally enforceable part of an employment relationship if such policies and

procedures instill "legitimate expectations" of job security in employees. *Id.* at 615.

It is well recognized that employers may enter into contractual relationships with

their employees that limit the employer's ability to fire an employee without a valid

reason to do so:

> Courts have recognized the following three ways by which a plaintiff can prove
> such contractual terms: (1) proof of a contractual provision for a definite term of
> employment or a provision forbidding discharge absent just cause; (2) an
> express agreement, either written or oral, regarding job security that is clear and
> unequivocal; or (3) a contractual provision, implied at law, where an employer's
> policies and procedures instill a "legitimate expectation" of job security in the
> employee.

*Lytle v. Malady*, 458 Mich. 153, 164, 579 N.W.2d 906, 911.

Plaintiff bases her breach of contract/legitimate expectations claim on Wyeth's Policy 55, which provides that "[y]ou will never be penalized for reporting compliance-related concerns."  Based on this statement and Wyeth's practices, Plaintiff says she had *Toussaint*-type legitimate expectations that Wyeth would not penalize her for reporting Cleveland and would fairly investigate Cleveland's false claims against her. Plaintiff says *Lytle* controls this case.

In response,  Wyeth cites *Dumas v. Auto Club*, 437 Mich 521, 473 N.W. 2d 652 (1991) and *Heurtebise v. Reliable Bus. Computers, Inc.*, 452 Mich 405, 414, 550 N.W. 2d 243 (1996) for the proposition that an employer's policy does not create an enforceable contract where its employee handbook contains an express disclaimer and the employer reserves the right to modify the policy at its sole discretion.

Wyeth notes that no Michigan Courts of record have extended the *Toussaint* legitimate expectations doctrine in any cases arising from employer-generated policies which (1) provide that an employee's employment is at-will, (2) declare that the policies and procedures do not constitute a contract of employment, and/or (3) provide that the employer reserves the right to alter, modify or amend the policies at its sole discretion.

Wyeth directs the Court to its HR Policy Manual, which contains the following provisions:

**INTRODUCTION**

**At-Will Employment**

This Human Resources Policy Manual contains the revised and consolidated personnel polices issued by Wyeth's Human Resources department. This policy manual supersedes all previous policy manuals, memos, announcements and

bulletins. **THIS MANUAL SHOULD NOT BE CONSTRUED AS AND DOES NOT CONSTITUTE A CONTRACT OF EMPLOYMENT. ALL EMPLOYMENT RELATIONSHIPS ARE NOT FOR ANY STATED PERIOD OF TIME BUT SHALL BE AT-WILL, AND EITHER THE EMPLOYEE OR THE COMPANY MAY TERMINATE THE RELATIONSHIP AT ANY TIME WITH OR WITHOUT CAUSE AND WITH OR WITHOUT NOTICE**.

and

**Changes and Modifications**

**THE COMPANY RESERVES THE RIGHT TO ALTER, MODIFY, AMEND OR TERMINATE IN WHOLE OR PART ANY OF ITS POLICIES OR GUIDELINES AT ANY TIME WITHOUT PRIOR NOTIFICATION**.

See Def. Motion, Exh. 33.

Wyeth's AFT Policy and its AFT "Q & A" also set forth the company's at-will policy, as well as its right to alter, amend or modify any company policy or program. See Dkt # 72, Def. Mot., Exh. 27, 39.  Plaintiff acknowledged her at-will employment status, in writing, on at least three occasions. See Dkt # 72, Def. Motion, Exh. 36, 37, 38.

Although the HR Policy Manual promises fair treatment of employees, the Michigan Supreme Court held that "a promise of fairness, without more, is too vague to judicially enforce." *Rood v. General Dynamics Corp.*, 444 Mich. 107, 141, 507 N.W.2d 591, 608 (1993).  The Court expressly limited *Toussaint* to the question of whether a just-cause employment contract exists and refused to extend the decision to construe management policies. See *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Ran*, 67 F. Supp. 2d 764 (E.D. Mich. 1999) (citing *Dumas*, 437 Mich. at 532).  In *Dumas*, the court explained:

that "given the traditional reluctance of courts to interfere with management decisions and the needed flexibility of businesses to change their policies to respond to changing economic circumstances, we conclude that *Toussaint* should not be extended to create legitimate expectations of a permanent compensation plan. Previous cases have not extended the legitimate-expectations theory to facts similar to these, and we decline the opportunity to extend the theory to compensation terms." *Id.*

Because *Toussaint* is limited to the question of whether a just cause contract exists, and Plaintiff does not allege, nor can she show she had a just cause contract or that she was discharged, the Court **GRANTS** summary judgment in favor of Defendants on the Breach of Contract/Legitimate Expectations claim.

### D. Discharge in Violation of Public Policy

Plaintiff bases this claim on her alleged constructive discharge.  Although an "at will" employee ordinarily may be terminated by an employer at any time and for any reason, Michigan allows lawsuits for discharges that are "so contrary to public policy as to be actionable." *Suchodolski v. Mich. Consol. Gas Co.*, 412 Mich. 692, 316 N.W.2d 710, 711 (Mich. 1982).

A claim of discharge in violation of public policy may rest on one of three grounds: (1) the employee is discharged in violation of an explicit legislative statement prohibiting discharge of employees who act in accordance with a statutory right or duty, (2) the employee is discharged for the failure or refusal to violate the law in the course of employment, or (3) the employee is discharged for exercising a right conferred by a well-established legislative enactment. *Edelberg v. Leco Corp.*, 236 Mich. App. 177, 599 N.W.2d 785, 786-87 (Mich. Ct. App. 1999) (citing *Suchodolski*, 316 N.W.2d at 711-712).

Plaintiff claims she engaged in protected activity by reporting Cleveland's

33

violations of federal law, i.e., off-label promotion, and that Wyeth improperly investigated and disciplined her in retaliation for not remaining silent.  She cites *Watassek v. Mich. Dept. Of Mental Health*, 143 Mich. App. 556 (1985) and *Meury v. Connie Kalitta Services/American Intern. Airways, Inc.*, 181 F3d 102 at *2 (6th Cir. 1999) in support of her contention that Michigan recognizes a public policy exception, allowing claims for discharge in retaliation for an employee's report of a legal violation to a supervisor.

However, *Watassek* was superceded by Michigan's Whistleblowers' Protection Act ("WPA"), M.C.L. § 15.361 *et seq.*, which provides the exclusive remedy for employees terminated in retaliation for reporting violations of law. *Whiting v. Allstate Ins. Co.*, 2010 U.S. Dist. LEXIS 23552 (E.D. Mich. March 15, 2010) (citing *Cushman-Lagerstrom v. Citizens Insurance Company of America*, 72 Fed. App'x 322, 329-330 (6th Cir. 2003)); see also *Dudewicz v. Norris-Schmid, Inc.*, 443 Mich. 68, 503 N.W.2d 645, 650 (Mich. 1993).  (The WPA prohibits the retaliatory discharge of an employee who reports, or is about to report, a violation of law to a public body).  There is no common law cause of action for discharge in retaliation for internal reporting of violations of law. *Whiting*, 2010 U.S. Dist. LEXIS 23552 at *21; *Cushman*, 72 Fed. App'x at 330.

Even if the Court accepted Plaintiff's proposition -- that a discharge for reporting violations of federal law concerning off-label promotion is a discharge in violation of public policy -- she fails to establish one important criterion – an actual discharge is central to such a claim.  This Court rejected Plaintiff's claim that issuance of the warning letter amounted to a constructive discharge.  She provides no other evidence to establish that she was discharged from her employment with Wyeth.

34

The Court **GRANTS** summary judgment in favor of Wyeth on Plaintiff's Public Policy Tort claim.

### E.   Motion to Strike Plaintiff's Supplemental Disclosure

Because the Court grants summary judgment in Defendants' favor on all claims. the Motion to Strike Plaintiff's Supplemental Disclosure is **DENIED** as moot.

### F.   Motion for Sanctions and Protective Order

Because the Court grants summary judgment in Defendants' favor on all claims, the Motion for Sanctions and Protective Order is **DENIED** as moot.

## V.   CONCLUSION

The Court: (1) **DENIES** Plaintiff's Motion for Partial Summary Judgment; (2) **GRANTS** Defendants' Motion for Summary Judgment; (3) **DENIES** Defendants' Motion to Strike Plaintiff's Untimely "Initial Disclosure" to Include New Witness; (4) **DENIES** Defendants' Motion to Strike Affidavits Associated with Plaintiff's Brief Opposing Defendants' Motion for Summary Judgment; and (5) **DENIES** Defendants' Motion for Sanctions and Protective Order.

**IT IS ORDERED**.

                                        S/Victoria A. Roberts
                                        Victoria A. Roberts
                                        United States District Judge

Dated:  May 19, 2010

The undersigned certifies that a copy of this document was served on the attorneys of record by electronic means or U.S. Mail on May 19, 2010.

s/Carol A. Pinegar
Deputy Clerk

35